ORDERED.

Dated: January 06, 2016

*Caryl E. Delano*
Caryl E. Delano
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                                              Case No. 9:14-bk-11774-FMD

    HWA Properties, Inc.,                                              Chapter 11

        Debtor.
_____/

**MEMORANDUM OPINION AND ORDER DENYING
(1) DEBTOR'S MOTION TO APPROVE COMPROMISE (DOC. NO. 138) AND
(2) CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION (DOC. NO. 175)**

The Chapter 11 Debtor seeks approval of a compromise with several creditors and confirmation of its proposed plan of reorganization. Court approval of broad release provisions and the issuance of a "bar order" that would prohibit parties from asserting any claims against Debtor and several non-debtor parties are integral to the compromise and the plan. After considering the factors that bankruptcy courts use to evaluate the propriety of a bar order, the Court concludes that the requested bar order is neither necessary to Debtor's successful reorganization nor fair and equitable. Therefore, the Court will deny approval of the compromise and confirmation of Debtor's plan.

## I. <u>Background</u>

Debtor, HWA Properties, Inc. ("Debtor"), is a Michigan corporation owned by Harry and Suzann Albright, each of whom owns 50% of Debtor's stock. Mr. and Mrs. Albright also own or control other entities, including Allied Capital Corp., Least, LLC, FMIRE, Inc., TarpHunt, LLC, RVHunt, LLC, Westnedge Square, LLC, TarpEst, LLC, and TP3, LLC. These entities, together with Mr. and Mrs. Albright and their respective attorneys, agents, predecessors, successors, and assigns, are defined in Debtor's Amended Plan of Reorganization ("Plan") as the "Albright Entities."[1]

Over the past 20 years, Debtor owned and developed real estate. On the date of its Chapter 11 bankruptcy filing, Debtor owned 13 undeveloped lots in the Tarpon Estates subdivision in Cape Coral, Florida (the "Tarpon Estates Lots"), vacant land in Portage, Michigan (the "Michigan Property"), and a beneficial interest in five acres of vacant land in Clewiston, Florida (the "Clewiston Property").[2]

The 13 Tarpon Estate Lots are encumbered by mortgages. Branch Banking & Trust ("BB&T") holds mortgage liens securing claims of $2,816,640.67 on ten of the Tarpon Estates lots;[3] Fifth Third Bank ("Fifth Third") holds mortgage liens securing claims of $757,410.01 on two of the lots;[4] and FineMark National Bank & Trust ("FineMark") holds a mortgage lien securing a claim of $2,198,030.69 on the one remaining lot and junior liens on seven of the other lots.[5]

Prior to filing its bankruptcy case, Debtor had transferred five lots in Tarpon Estates (Lot Nos. 22, 28, 34, 36, and 42) to an Albright Entity, TarpHunt, LLC ("TarpHunt"). The five lots were subject to mortgage liens held by Huntington National Bank ("Huntington"), securing a debt of over

---

[1] Doc. No. 175, p. 8 of 62.
[2] Doc. No. 16, Schedule A, pp. 3-4.
[3] Claim No. 14.
[4] Claim No. 17.
[5] Claim No. 12.

2

$1,400,000.00. Huntington agreed to accept the discounted payment of $750,000.00 in full satisfaction of its mortgage liens. TarpHunt then quitclaimed the five lots to another Albright Entity, FMIRE, Inc. ("FMIRE"), which funded the $750,000.00 payoff to Huntington. Also prepetition, Debtor transferred three other lots in Tarpon Estates (Lot Nos. 23, 33, and 35) to FMIRE.

As of the petition date, FMIRE still owned five of the lots it had acquired from TarpHunt and Debtor. Davis Trust I and Davis Trust II (together, the "Davis Group") made loans to FMIRE on four of those lots (Lot Nos. 23, 33, 35, and 36) and holds mortgages securing claims totaling $1,750,000.00. Mr. and Mrs. Albright personally guaranteed the loans to the Davis Group. The parties agree that the value of the four lots financed by the Davis Group far exceeds its loans.

Least, LLC ("Least"), another Albright Entity, holds a mortgage on the Michigan Property. Debtor listed Least in its bankruptcy schedules as holding a secured claim for $1,133,931.74.[6] Debtor valued the Michigan Property in its schedules at $200,000.00.[7]

IberiaBank holds a claim for $241,384.62 secured by a mortgage on the Clewiston Property.[8] During the Chapter 11 case, Debtor and some of the Albright Entities, including Mr. and Mrs. Albright, entered into a compromise agreement with IberiaBank. No creditors objected, and the Court approved the compromise.[9] Under the compromise with IberiaBank, Debtor is to issue a deed in lieu of foreclosure to the Clewiston Property to IberiaBank, and one of the Albright Entities is to pay $25,000.00 to IberiaBank. IberiaBank agreed to waive its remaining deficiency claim.

Debtor's primary unsecured creditor is BCB Tarpon, LLC ("BCB Tarpon"). Prior to Debtor's bankruptcy filing, BCB Tarpon sued Debtor and Mr. Albright in state court. Although the lawsuit was stayed as to Debtor upon its bankruptcy filing, BCB Tarpon obtained a stipulated

---

[6] Doc. No. 151, p. 13.
[7] *Id.*
[8] Claim No. 13.
[9] Doc. Nos. 103, 107.

judgment against Mr. Albright for $3,444,039.93. BCB Tarpon filed a proof of claim for $3,636,330.16,[10] to which Debtor objected.[11]

As set forth in its *Motion to Appoint Chapter 11 Trustee or, in the Alternative, to Dismiss Case*,[12] BCB Tarpon contends that Debtor's prepetition transfers of properties to TarpHunt and FMIRE are avoidable under 11 U.S.C. § 548[13] as fraudulent transfers because they were made for little or no consideration. Debtor denies that the transfers were fraudulent.

Last, although Community & Southern Bank ("C&S") is not a creditor of Debtor, it holds a judgment against Mr. Albright of approximately $1,912,000.00.[14]

## II. The Proposed Compromise and Chapter 11 Plan

Debtor engaged in considerable negotiations with several of its creditors in an effort to reorganize. Ultimately, Debtor reached a global compromise between BCB Tarpon, BB&T, and FineMark, on the one hand, and Debtor, Mr. Albright, Mrs. Albright, FMIRE, and Least on the other.[15] Under the proposed compromise (the "Compromise"), the following transactions were contemplated:

Transactions Involving BB&T

(a) Debtor to transfer title to nine of the ten Tarpon Estates Lots that are subject to BB&T's mortgage to BCB Tarpon. BCB Tarpon and BB&T agreed to negotiate the amount and terms of repayment between themselves.

(b) Debtor to sell the tenth Tarpon Estates Lot that is subject to BB&T's mortgage (Lot No. 41) to TarpEst, LLC ("TarpEst") for a purchase price sufficient to net $119,000.00. The net sales proceeds are to be paid to BB&T and credited against its claim.

---

[10] Claim No. 11.
[11] Doc. No. 84.
[12] Doc. No. 65.
[13] Unless otherwise noted, all statutory references are to Title 11 of the United States Code.
[14] Claim No. 8. (C&S later withdrew this claim (Doc. No. 157)); Debtor scheduled C&S as a disputed claim (Doc. No. 151, p. 11). *See also* Doc. No 131, citing *HWA Properties, Inc. v. Community & Southern Bank*, 746 S.E. 2d 609, 615-16 (Ga. Ct. App. 2013) (affirming C&S's judgment against Mr. Albright).
[15] Doc. No. 138.

4

    (c)    TarpEst to pay $65,642.20 toward outstanding property taxes on the lots being transferred to BCB Tarpon. BB&T to pay an additional $65,642.20 toward the property taxes and then add that amount to the claim being assumed by BCB Tarpon.

    (d)    Upon receipt of a financial statement from Mr. Albright, BB&T to release all guarantors of the BB&T obligations.

BB&T is a party to the Compromise and consents to this treatment.

<u>Transactions Involving Fifth Third</u>

    (e)    Debtor to transfer the two Tarpon Estates Lots on which Fifth Third has a mortgage to BCB Tarpon, subject to Fifth Third's mortgage. The mortgage was to be restructured under Debtor's Chapter 11 plan.

Fifth Third Bank did not object to the Compromise.

<u>Transactions Involving FineMark</u>

    (f)    Debtor to transfer the Tarpon Estates Lot on which FineMark holds a senior mortgage (Lot No. 29) to either FMIRE or TarpEst, or to any other entity to which FineMark agrees, subject to FineMark's mortgage lien.

    (g)    FineMark to release any junior liens it has on other lots and will waive payment on its deficiency claim.

FineMark is a party to the Compromise and consents to this treatment.

<u>Transactions Involving the Davis Group</u>

    (h)    FMIRE to transfer the four Tarpon Estates Lots that are subject to the Davis Group's mortgage back to Debtor, and Debtor to then transfer those four lots to BCB Tarpon, subject to the Davis Group's mortgages. The Davis Group's loans, which currently bear interest at 12% per annum and mature in July 2016,[16] were to be restructured under Debtor's Chapter 11 plan to provide for principal payments and interest at 6% per annum, amortized over 15 years, with payments due upon the sale of the lots. The lots were to be marketed during the tourism season in Southwest Florida (generally from Thanksgiving through Easter).

The Davis Group was not a party to the Compromise and objects to this treatment.

<u>Transactions Involving Least</u>

    (i)    Debtor to transfer the Michigan Property to Least in full satisfaction of its claim. Least will not have an unsecured claim in this case.

---

[16] Doc. No. 147.

Transactions Involving FMIRE

(j)    FMIRE to transfer back to Debtor four of the five lots it now owns (lots that were transferred to it prepetition by Debtor as described above); FMIRE to retain the fifth lot (Lot No. 42), and all claims relating to that lot to be released and barred.

Treatment of BCB Tarpon

(k)    BCB Tarpon to receive a total of 15 Tarpon Estate Lots (11 lots directly from Debtor that are subject to the liens of BB&T and Fifth Third; and four lots that FMIRE will transfer to Debtor for its subsequent transfer to BCB Tarpon, as outlined above) and to receive 100% of the shares of the reorganized debtor in exchange for a credit of $50,000.00 on account of its unsecured claim.

BCB Tarpon is a party to the Compromise and consents to this treatment.

Releases and Bar Order

The Compromise provides for Debtor, the bankruptcy estate, and BCB Tarpon to exchange mutual releases of all claims with the Albright Entities. The Compromise also requires, as a condition precedent to the settlement, that the Court enter a bar order, barring all claims against BCB Tarpon, Debtor, the Albright Entities, and Mr. and Mrs. Albright that relate in any way to Debtor, including the Davis Group, which is not a creditor of Debtor.

Debtor's Chapter 11 plan (the "Plan")[17] incorporates the terms of the Compromise. In addition, Sections 11.4.1 and 11.4.3 of the Plan provide that Debtor, the reorganized debtor, BCB Tarpon, and all holders of claims and equity interests [of Debtor] are deemed to have unconditionally released the Albright Entities, including Mr. and Mrs. Albright, and that the order confirming the Plan will contain a bar order enjoining creditors, *and the Davis Group and C&S*, from pursuing any claim against the Albright Entities, including Mr. and Mrs. Albright.

In consideration of the proposed bar order, FMIRE is to transfer four of the five Tarpon Estate Lots it now owns to BCB Tarpon (through Debtor as the intermediate transferee), TarpEst is

---

[17] Doc. No. 175.

to pay $65,642.20 toward outstanding property taxes on the lots being transferred to BCB Tarpon, and Mr. and Mrs. Albright are to pay Debtor's attorney's fees incurred in this case, estimated at $145,000.00.[18]

The net result of the Compromise and the Plan, if approved by the Court, would be as follows:

(a) FMIRE (an Albright Entity) returns four of the five Tarpon Estates Lots transferred to it by Debtor prepetition; those four lots would be transferred to BCB Tarpon; BCB Tarpon acquires title to 15 lots (the four FMIRE lots and 11 lots from Debtor) to satisfy its approximately $3.6 million claim;

(b) FMIRE (an Albright Entity) retains ownership of Lot No. 42; TarpEst (an Albright Entity) purchases Lot No. 41 from Debtor with the proceeds going to BB&T; Debtor transfers Lot No. 29, subject to Finemark's lien, to either FMIRE or TarpEst (both Albright Entities); and Least (an Albright Entity) obtains title to the Michigan Property;

(c) IberiaBank, under the terms of the separate compromise already approved by the Court, obtains ownership of the Clewiston Property;

(d) HWA, as the reorganized debtor, no longer owns any assets, and its stock interests are transferred to BCB Tarpon; and

(e) Mr. and Mrs. Albright and the Albright Entities are released of all liability by BCB Tarpon and BB&T; and their individual creditors, including the Davis Group and C&S, are barred from pursuing claims or taking any action against them.

---

[18]At the time the Compromise was filed, the Court had approved attorney's fees to Debtor's counsel in the amount of $35,549.00 (Doc. No. 109). Debtor's counsel has since filed another application for compensation seeking an additional $106,369.50 in fees (Doc. No. 241) for the time period prior to the Court's denial of the Compromise and for which the Albrights would have been responsible had the Compromise been approved.

The United States Trustee, the Davis Group, and C&S object to the proposed release and bar order provisions of the Compromise and Plan.[19] The objecting parties contend that, as a matter of law, the Court can neither approve the proposed release and bar order nor confirm the Plan. Debtor contends that the release and bar order are essential to its reorganization and that consideration is being provided for the bar order by FMIRE (the transfer of the four lots to Debtor), by TarpEst (the payment of $65,642.20 in property taxes) and by Mr. and Mrs. Albright (the payment of Debtor's attorney's fees). Debtor and the Albrights also contend that the Davis Group has no real claim against the Albrights on account of their personal guarantees because the value of the Davis Group's collateral far exceeds its loans and that C&S's judgment, which is against Mr. Albright alone and not against Mrs. Albright, is uncollectible.

### III.  Legal Analysis

A.  **Bankruptcy Court's Authority to Approve Releases of Non-Debtor Parties and to Issue Bar Orders**

In *In re Transit Group, Inc.*,[20] the bankruptcy court noted a recent trend of debtors seeking to expand the scope of the discharge injunction to include the release of claims against non-debtor third parties and insiders. The court observed a split among the circuit courts of appeals on the issue of whether courts have the authority to approve such releases.[21] The Fifth, Ninth, and Tenth Circuit Courts of Appeals have refused to approve non-debtor releases.[22] Other circuits, however, including

---

[19] Doc. Nos. 144, 147, and 148.
[20] 286 B.R. 811 (Bankr. M.D. Fla. 2002).
[21] *Id.* at 815-16.
[22]*In re Zale Corp.*, 62 F.3d 746, 760-61 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re Western Real Estate Fund, Inc.*, 922 F. 2d 592, 601-02 (10th Cir. 1990).

the Second, Third, Fourth, Sixth, and Seventh Circuit Courts of Appeals, have held that non-debtor releases may be approved in appropriate circumstances.[23]

Courts that approve non-debtor releases and enter bar orders typically find such releases to be legally permissible under two provisions of the Bankruptcy Code. First, under 11 U.S.C. § 105(a), bankruptcy courts enjoy broad equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Second, § 1123(b)(6) states that a plan of reorganization may "include any other appropriate provision not inconsistent with the applicable provisions of this title."

Of course, neither of these provisions of the Bankruptcy Code expressly addresses a release of claims by third parties against non-debtors. And because a court's power under § 105 is not unlimited (courts invoking their § 105 powers must still act within the confines of the Bankruptcy Code),[24] § 105 cannot be used to authorize relief that is otherwise prohibited by another specific provision of the Bankruptcy Code.[25] Thus, the question remains whether non-debtor releases are "appropriate" or "not inconsistent" with the Bankruptcy Code.

Courts that refuse to approve non-debtor releases look to § 524(e) to resolve the issue. Section 524(e) states that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Those courts interpret § 524(e) as being a specific, inconsistent provision of the Bankruptcy Code such that bankruptcy courts lack the power under § 105(a) to discharge claims against non-debtors.

---

[23] *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344, 347 (4th Cir. 2014); *In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005); *In re Continental Airlines*, 203 F.3d 203, 213-14 (3d Cir. 2000) (declining to establish a rule regarding conditions under which non-debtor releases and bar orders would be appropriate or permissible, but suggesting that such releases and injunction could potentially be permissible).
[24] *In re Transit Group, Inc.*, 286 B.R. at 815.
[25] *Id.*

But the courts that will approve non-debtor releases have concluded that there is no conflict between §§ 105(a) and 524(e). These courts reason that § 524(e) does not expressly state that another party's debt cannot be discharged under a confirmed plan of reorganization, but merely provides that the discharge of the debtor's liability under a reorganization plan does not, by itself, affect the liability of other parties. So, these courts reason, because § 524(e) does not expressly prohibit a plan from providing for non-debtor releases, the bankruptcy court has the power to approve the release and issue a bar order under § 105(a) as long as the circumstances justify such extraordinary relief.[26]

The Eleventh Circuit Court of Appeals first approved a release of non-debtor claims in *In re Munford*.[27] There, the debtor sued several defendants for breach of fiduciary duties in connection with a leveraged buy-out. One defendant offered to settle, but its settlement offer was conditioned on the bankruptcy court's issuance of a bar order that would permanently enjoin the non-settling co-defendants from later pursuing contribution or indemnity claims against it. The bankruptcy court approved the compromise and issued the bar order in favor of the settling defendant, finding that the settling defendant's insurance policy that would fund the settlement was the settling party's only substantial asset and that the non-settling defendants were receiving a dollar-for-dollar credit against any judgment that might subsequently awarded against them.

On appeal, the Eleventh Circuit held that the bankruptcy court had ample authority under § 105(a) and Fed. R. Civ. P. 16 to issue the bar order. The Eleventh Circuit cited three justifications for entering bar orders in bankruptcy cases: (i) public policy strongly favors pretrial settlement due to the potential of a complex case to drain resources; (ii) litigation costs are particularly burdensome on the bankruptcy estate given the financial instability of the estate; and (iii) bar orders play an

---

[26] *See generally In re Transit Group*, 286 B.R. at 816.
[27] 97 F.3d 449 (11th Cir. 1996).

integral role in facilitating settlement.[28] Regarding the third justification, the court noted that but for the bar order, the settling defendant would not have entered into the settlement agreement with the debtor.[29] The court then held that "section 105(a) and rule 16 authorize bankruptcy courts to enter bar orders where such orders are integral to settlement in an adversary proceeding."[30]

In *In re Dow Corning Corp.*,[31] the Sixth Circuit Court of Appeals was asked to decide "whether a bankruptcy court has the authority to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan under Chapter 11 of the Bankruptcy Code."[32] The court held that such an injunction is not inconsistent with the Bankruptcy Code, but is appropriate only in "unusual circumstances."[33]

To determine whether such unusual circumstances exist, the *Dow Corning* court listed seven factors for courts to consider when asked to enjoin a non-consenting creditor's claims against a non-debtor:

(1)   There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2)   The non-debtor has contributed substantial assets to the reorganization;

(3)   The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4)   The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5)   The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

---

[28] *Munford*, 97 F.3d at 455.
[29] *Id.*
[30] *Id.*
[31] 280 F.3d 648 (6th Cir. 2002).
[32] *Id.* at 656.
[33] *Id.* at 658.

(6)      The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(7)      The bankruptcy court made a record of specific factual findings that support its conclusions.[34]

Recently, the Eleventh Circuit Court reaffirmed the legality of bar orders in *In re Seaside Engineering & Surveying, Inc.*[35] The court noted that the circumstances in *Seaside Engineering* differed from those *Munford* in that the releases in *Seaside Engineering* would "prevent claims against non-debtors that would undermine the operations of, and doom the possibility of success for, the reorganized [debtor],"[36] whereas in *Munford*, the requested bar order was in the context of a settlement agreement.

In *Seaside Engineering*, the Eleventh Circuit expressly rejected the position that § 524(e) altogether restricts the bankruptcy court's authority under § 105(a) to issue bar orders.[37] Instead, the court stated that bar orders are permissible, but it cautioned that they should not be issued lightly and "should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances."[38] The court commended for consideration the seven *Dow Corning* factors,[39] stating that which of the factors would be relevant in a particular case is a matter left to the discretion of the bankruptcy court. The court further stated that the bankruptcy court must always keep in mind that bar orders are to be used "cautiously and infrequently" and "only where essential, fair, and equitable."[40]

---

[34] *Id.*
[35] 780 F.3d 1070 (11th Cir. 2015).
[36] *Id.* at 1077.
[37] *Id.* at 1078.
[38] *Id.*
[39] *Id.* at 1079 (citing *Dow Corning*, 280 F.3d 648 (6th Cir. 2002)).
[40] *Id.* (internal citations omitted).

B.  **Application of the *Dow Corning* Factors to the Requested Bar Order**

As directed by the Eleventh Circuit in *Seaside Engineering*, the Court has evaluated the *Dow Corning* factors as follows.

1. **Whether there is an identity of interests between the debtor and the third party (against whom the claim would be barred), such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate**

Litigation by other creditors against the Albrights or the Albright entities will have no impact upon the estate and will not deplete the assets of the estate. This is because the Plan provides for the assets of Debtor's estate to be transferred to BCB Tarpon and Albright Entities; the reorganized debtor will have no assets.

This factor militates against the bar order.

2. **Whether the non-debtor has contributed substantial assets to the reorganization**

Courts evaluating this factor have found a contribution to be "substantial" where the contribution consists of most of the assets of the contributing party. For example, in *In re J.C. Householder Land Trust # 1*,[41] the court issued a bar order where the non-debtors' significant contribution resulted in the depletion of their own personal assets and the non-debtors were contributing their time and services in order to make reorganization feasible. Similarly, in *In re Karta Corp.*,[42] the court issued a bar order where the non-debtors had waived claims against the debtor and had made personal financial contributions of approximately $460,000.00.

In contrast, where released parties have not contributed substantial assets to the reorganization efforts, courts have refused to approve the proposed release. In *In re Mahoney Hawkes, LLP*,[43] the debtor, a law firm, proposed a plan of reorganization that contemplated a permanent injunction and releases for the individual partners of the firm from outstanding

---

[41] 501 B.R. 441, 459 (Bankr. M.D. Fla. 2013).
[42] 342 B.R. 45, 56 n. 2 (S.D.N.Y. 2006).
[43] 289 B.R. 285 (Bankr. D. Mass. 2002).

malpractice claims. In exchange, the partners were to each make a $200,000.00 contribution that would partially fund the debtor's plan of reorganization. The court held that it could not determine whether the proposed monetary contributions were substantial because there was no evidence regarding what additional amounts the partners may have been able to pay.[44] The court ultimately found that it could not approve the proposed plan, including the requested bar order.

In *In re M.J.H. Leasing, Inc.*,[45] two corporate debtors filed a plan of reorganization that provided for the release and discharge of their principals' liability to a creditor under a general indemnity agreement. The creditor objected, arguing that the release of its claims against the individuals deprived it of additional security to which it was entitled. In analyzing whether the principals had contributed substantial assets to the debtors' reorganization, the court noted that the only contribution the principals had offered was to continue their employment for the debtors.[46] The court held that there was an insufficient record regarding whether the principals had any other assets they could contribute to the reorganization. The court also held that there was no basis upon which it could conclude that the principals themselves (as opposed to unaffiliated third parties) were the only persons whose employment would keep the debtors operating. The court implied that if the principals were uniquely qualified to render services to the debtors, then perhaps there would be a basis to find their contribution of continued employment to be significant. But with no information to support that proposition, the court concluded that it could not find the proposed contribution to be significant for purposes of approving the requested bar order.[47]

In this case, the Plan proposes three sources of non-debtor contributions: FMIRE's transfer of four Tarpon Estates Lots to Debtor for transfer to BCB Tarpon; TarpEst's payment of $65,642.20

---

[44] *Id.* at 302.
[45] 328 B.R. 363 (Bankr. D. Mass. 2005).
[46] *Id.* at 371.
[47] *Id.*

in property taxes; and the Albrights' payment of Debtor's attorney's fees in the approximate amount of $145,000.[48]

But FMIRE's contribution of the four Tarpon Estate Lots does not inure to Debtor's benefit, as Debtor will immediately transfer the lots to BCB Tarpon.[49] Instead, FMIRE's contribution resolves the potential fraudulent transfer litigation threatened by BCB Tarpon against FMIRE as the recipient of Debtor's prepetition transfer of the eight Tarpon Estate Lots.

Likewise, TarpEst's payment of property taxes does not inure to the bankruptcy estate. While facilitating the Compromise, the payment benefits only two parties: BCB Tarpon, the recipient of the Tarpon Estates Lots on which the taxes are owed, and BB&T, the lienholder on those lots.

Regarding the Albrights' payment of Debtor's attorney's fees, there was no proffer regarding the Albright's financial circumstances that would permit the Court to evaluate whether their contribution is "substantial." And, under the Plan and the Compromise, Lots 29, 41, 42 and the Michigan Property will be owned by Albright Entities, which are owned or controlled by Mr. and Mrs. Albright. Last, the Court concludes that the Albrights' payment of Debtor's attorney's fees does not benefit or contribute to Debtor's reorganization because there is no true reorganization under the Plan. Rather, it is obvious that the Plan's purpose was to resolve the Albrights' liability to their own creditors, particularly BCB Tarpon and C&S.

As in *M.J.H. Leasing*, the Court cannot conclude that the proposed contributions by FMIRE, TarpEst, or the Albrights are "substantial."

This factor militates against the bar order.

---

[48] Doc. No. 138, pp. 6-8; Doc. No. 175, pp. 20, 26.
[49] Of course, fraudulent transfer claims in a bankruptcy case are for the benefit of the bankruptcy estate and are prosecuted for the purpose of making distributions to all creditors, not a single creditor who also holds a judgment against the debtor's principal.

3. **Whether the injunction is essential to the reorganization (i.e., whether the reorganization hinges on the debtor being free from indirect suits by parties who would have indemnity or contribution claims against the debtor)**

This factor does not apply because neither the Davis Group nor C&S has a claim against Debtor. Therefore, there is little likelihood that Debtor would be subject to indemnity or contribution claims.

4. **Whether the impacted class or classes of creditors has overwhelmingly voted to accept the plan**

C&S and the Davis Group are most affected by the proposed releases and bar order. Neither has voted to accept the Plan. Although the Plan classifies the Davis Group as a creditor, Debtor has no obligation to it; its borrower is FMIRE. The Davis Group could be subject to treatment under the Plan *only* if its collateral is brought into Debtor's bankruptcy estate. And C&S, the holder of a large judgment against Mr. Albright alone, is not a creditor and is not included in a class under the Plan. As such, C&S will receive no distribution under the Plan, and it has no ability to vote on the Plan.

This factor militates against the bar order.

5. **Whether the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction**

C&S is not a creditor in this case and will receive nothing under the Plan. Even if C&S were able to participate in a distribution under the Plan, its distribution, given the amount of BCB Tarpon's claim, would be *de minimis*.

This factor militates against the bar order.

6. **Whether the plan provides an opportunity for those claimants who choose not to settle to recover in full**

C&S has not settled with Debtor or Mr. Albright, and the Plan does not provide C&S an opportunity to recover on its judgment in full. To the contrary, the bar order would eliminate any possibility of a future recovery.

**7. Whether the bankruptcy court made a record of specific factual findings that support its conclusions**

The Court's findings, as set forth above, do not support the entry of a bar order.

## IV. Conclusion

Given the facts of this case, the Court cannot find that a bar order is necessary to Debtor's reorganization or fair and equitable. The Court appreciates that Debtor, the Albrights, the Albright Entities, BCB Tarpon, FineMark, and BB&T have worked hard to resolve their disputes. Accomplishing a global compromise among these parties was surely a difficult endeavor, and their efforts have not gone unnoticed by the Court. But the fundamental problem in this case is that the Plan does not propose a true reorganization; instead, the Plan is a restructuring of various obligations in an effort to obtain releases for Mr. and Mrs. Albright and their entities.

For the Albrights to seek to resolve their issues with C&S in the context of Debtor's Chapter 11 case, a case in which C&S is not even a creditor, is a step too far. If Mr. Albright wants a discharge of his obligation to C&S, he should file his own bankruptcy. It is not fair and equitable for a judgment debtor to obtain what is, in effect, a Chapter 7 discharge when that party has not made full disclosure of his assets and liabilities and submitted to the administration of a Chapter 7 trustee. While the Court does not necessarily find such an attempt to be an exercise in bad faith, it weighs heavily against the issuance of the requested bar order.

Accordingly, for the foregoing reasons, the motion for approval of the Compromise is denied and confirmation of Debtor's Plan is denied, without prejudice to Debtor's filing an amended plan. By separate order, the Court has terminated exclusivity and set deadlines for filing competing plans.

The Clerk's office is directed to serve a copy of this order on interested parties via CM/ECF.